Exhibit B

Deposition of Charles Gerow

IN  THE  UNITED  STATES  DISTRICT  COURT

FOR  THE  EASTERN  DISTRICT  OF  PENNSYLVANIA

CIVIL  DIVISION

– – –

ANDREW  R.  PERRONG                    :2:22-cv-04013
                                               :
               vs.                            :
                                               :
CHARLIE  FOR  GOVERNOR,  CHARLES :
GEROW,  and  MARGUERITE  LUKSIK  :

_____

        Deposition  of  CHARLES  GEROW,  taken  at
2657  Mt.  Carmel  Avenue,  Glenside,
Pennsylvania  on  Thursday,  November  9,  2023,
commencing  at  10:00  a.m.  before  Kimberly  A.
Bursner,  Registered  Professional  Reporter
and  Notary  Public.

_____

```
1    COUNSEL APPEARED AS FOLLOWS:

2                    ANDREW R. PERRONG, ESQUIRE
                         Pro Se Plaintiff
3
                     CHARLES GEROW, ESQUIRE
4                        Pro Se Defendant

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                          I N D E X

 2                          -  -  -  -

 3      WITNESS:                                    PAGE:

 4      CHARLES GEROW

 5           By Mr. Perrong                            4

 6                              -  -  -

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    (It is hereby stipulated by and
 2           between counsel that the sealing and
 3           certification are waived; and that all
 4           objections, except as to the form of the
 5           question, are reserved until the time of
 6           trial.)
 7                              - - -
 8                    CHARLES GEROW, after having been duly
 9            sworn, was examined and testified as
10            follows:
11                              - - -
12     BY MR. PERRONG:
13     Q     Please state your full name, for the record.
14     A     It's Charles Gerow, G-e-r-o-w.
15     Q     Have you ever been deposed before, Mr. Gerow?
16     A     Yes.
17     Q     In what cases have you been deposed before?
18     A     I don't recall the cases.  It's been -- but
19     I've been deposed before.
20     Q     Just want to go over some ground rules for the
21     deposition before we begin.  We could just try and
22     not speak over each other.  No head shakes or other
23     nonverbal responses because the court reporter
24     won't be able to understand that.  If you don't
25     understand a question that I give you, I'll
```

1    rephrase the question and if you answer the

2    question, I'll assume that you understand and happy

3    to take a break whenever we need.  Just let me

4    know.  The only thing I ask is that we not take a

5    break when a question is pending.

6                    Do you understand?

7    A    I do.

8    Q    Do you understand that you are under oath

9    today and this oath is the same as if you were in

10   court before a judge and jury?

11   A    I do.

12   Q    Is there anything that -- any reason today why

13   you would be unable to provide truthful and

14   accurate testimony?

15   A    Not that I'm aware of.

16   Q    Any reason why you would be unable to recall

17   any of your answers today?

18   A    Not that I'm aware of.

19   Q    Did you do anything to prepare for your

20   deposition today?

21   A    No.

22   Q    Did you discuss this litigation with any other

23   employees of the Charlie for Governor campaign?

24   A    Not recently.

25   Q    At what point did you discuss this litigation

1    with other employees of Charlie for Governor

2    campaign?

3    A    At some point just after the action was filed.

4    Q    And for what purpose was -- were those

5    communications?

6    A    To determine whether or not Charlie for

7    Governor was even in existence at that point.

8    Q    Who did you talk to to ascertain that?

9    A    Doug Rickard.

10   Q    Could you spell his last name, please?

11   A    I believe it's R-i-c-k-a-r-d.

12   Q    And what is his position in the campaign?

13   A    He was the treasurer.

14   Q    Did you speak at all to Marguerite Luksik?

15   A    I haven't spoken to her since the action was

16   filed.

17   Q    Did you review any documents to prepare for

18   today's deposition?

19   A    No.

20   Q    Have you begun the process of searching for or

21   attempting to search for documents responsive to my

22   request for production?

23   A    Yes.

24   Q    And what documents are you searching for?

25   A    The documents that you requested in your

1    interrogatories.

2    Q    Is anybody helping you in regards to that?

3    A    No.

4    Q    Briefly, what's your educational background

5    starting from high school?

6    A    High school diploma, Bachelor of Arts and a

7    Juris Doctorate degree.

8    Q    Where did you get your JD from?

9    A    Villanova University.

10   Q    And what jobs have you held in the past ten

11   years?

12   A    CEO of Quantum Communications.

13   Q    What does Quantum Communications do?

14   A    It's a strategic communications firm.

15   Q    Is it for -- is it a communications firm for a

16   specific industry?

17   A    No.  I'm going to object to relevance.  I

18   don't know how this is relevant.  I'm objecting as

19   to relevance.  I'll answer the question, but I'm

20   objecting as to relevance.

21   Q    How long have you been in your role at Quantum

22   Communications?

23   A    More than 20 years.

24   Q    And you were a candidate for governor of

25   Pennsylvania; is that correct?

1   A    I was a candidate.  Past tense.

2   Q    What was your role on the campaign for your

3   candidacy for governor?

4   A    I just answered that.  Asked and answered.  I

5   was a candidate for governor.

6   Q    What individuals were involved in your

7   campaign for governor?

8   A    Scores of individuals were involved.

9   Q    Who were the individuals on the campaign --

10  A    Objection as to relevance.  I'm here as a fact

11  witness in my capacity as an individual defendant.

12  Questions about the campaign could be addressed to

13  the campaign.

14  Q    I'm asking you, sir, for information in your

15  knowledge and direct --

16  A    That aren't relevant to me as a defendant.

17  Q    Again, this is a deposition under the rules of

18  civil procedure -- under the rules --

19  A    I'm very familiar with the rules of civil

20  procedure.

21  Q    And relevance --

22  A    I just want my -- I just want my objection

23  noted on the record.

24  Q    It's my contention that relevance is not a

25  proper objection.

1    A    If you're going to argue, that's fine.  You

2    can argue on the record.  I want my objection noted

3    on the record.  That's all.

4              Now, what was the question again?

5    Q    Who on the campaign directly reported to you?

6    A    I wouldn't consider anybody a, quote, unquote,

7    direct report because I didn't run the campaign.

8    The campaign was run by the team that was put in

9    place to manage it.

10   Q    Who were the members of that team that managed

11   your campaign?

12   A    There were -- there were a lot of people were

13   involved.

14   Q    Can you name names of individuals who were on

15   the campaign?

16   A    I can name some, but not all from memory.  Peg

17   Luksik, who you are aware of.  Jen Montefor.  And I

18   would have some difficulty spelling her last name,

19   but I think it's M-o-n-t-e-f-o-r.  Pardon me.

20   Kevin Harley, H-a-r-l-e-y.  Doug Rickard, who I

21   already mentioned.  John Storey, S-t-o-r-e-y.

22   Those would be the principal folks, but there were

23   many many others.

24   Q    What was Peg Luksik's role on the campaign?

25   A    She was the campaign manager.

1    Q    And what was Congressman G.T. Thompson's role

2    on the campaign?

3    A    He had no specific role.  He was the person

4    who recruited me to run for governor.

5    Q    Where did you keep documents related to your

6    candidacy and campaign?

7    A    Which documents are you asking about?  There

8    were lots of documents.  Which documents

9    specifically do you want to ask me about?

10   Q    Documents related to your campaign?

11   A    Which documents?  There were lots of documents

12   related to the campaign.

13   Q    I'm just asking for a categorization of where

14   those documents were kept?

15   A    Are you asking for the financial records?  The

16   records of what was performed on the ground?  Are

17   you asking for data bases that we may have

18   maintained, et cetera?  Your question is not

19   specific and I can't answer it as asked.

20   Q    Where were the data bases for the campaign?

21   A    At Quantum Communication's office.

22   Q    And where were documents related to telephone

23   calls maintained?

24   A    I don't know that we maintained any records of

25   telephone calls.

1    Q    Where were the financial records for the

2    campaign maintained?

3    A    Doug Rickard maintained those.

4    Q    I take it that he maintained those in his

5    office?

6    A    I assume so.

7    Q    Did the campaign reimburse Quantum

8    Communications for use of its office?

9    A    I believe they did, but I can -- I don't know

10    how this is relevant and I'm going to object on the

11    basis of relevance.  This is not relevant to your

12    case in any way.  If you want to fish, we can go

13    fishing, but why don't you ask questions that are

14    related to the case?

15    Q    Did you maintain a separate office apart from

16    Quantum Communications for campaign activities?

17    A    There was an office.  Again, I'm going to

18    object to the relevance of this.  This has nothing

19    to do with anything contained in your pleading.

20    Nothing.

21    Q    Well, there is a question pending.  And that

22    is, did you maintain a separate office for campaign

23    activities?

24    A    When you say "separate office," there was a

25    separate area in the building, yes.

1    Q    In the Quantum Communications building?

2    A    Yes.

3    Q    I want to play two recordings for you.  I'm

4    going to start playing the first call now.

5                            - - -

6                (Whereupon, an audio recording was

7    played.)

8                            - - -

9    BY MR. PERRONG:

10   Q    Do you recognize that recording?

11   A    No.

12   Q    Why don't you recognize that recording?

13   A    I don't recognize it.  I've never heard that

14   recording before, so I don't recognize it.

15   Q    Was that a call that the -- your campaign for

16   governor authorized?

17   A    I don't know.

18   Q    You were the candidate on that campaign, were

19   you not?

20   A    Asked and answered.

21   Q    Who on the campaign authorized that call?

22   A    I don't know.

23   Q    Whose idea was it to make that call?

24   A    I'm not sure.  It was -- the program was

25   suggested to us by Congressman Thompson, but I

1      don't know who suggested that specific call.

2      Q     When you say "the program," what are you

3      referring to when you say program?

4      A     The Tela-Town Hall or however it was referred

5      to.

6      Q     Are you familiar with the telephone number

7      (223) 322-0506?

8      A     No.

9      Q     Are you familiar with the telephone number

10     (223) 322-0908?

11     A     No.

12     Q     Are you familiar with the telephone number

13     (855) 756-7250?

14     A     No.

15     Q     Were those numbers that might have been used

16     by the campaign?

17     A     I just told you, I'm not familiar with them.

18     How would I possibly know what they might have been

19     used for?

20     Q     I'm going to play a second recording here.

21                          - - -

22                 (Whereupon, an audio recording was

23     played.)

24                          - - -

25     BY MR. PERRONG:

1    Q    Do you recognize that call?

2    A    That's the first time I've heard it.

3    Q    That's your voice on the call at the second

4    part of that call; is that correct?

5    A    Certainly sounds that way.

6    Q    Was that portion prerecorded or was that live?

7    A    It was prerecorded, I'm sure.

8    Q    Do you have any recollection as to when you

9    would have recorded that?

10   A    None.

11   Q    Do you have any recollection of what device

12   you used to record that?

13   A    A telephone.

14   Q    Would that be your iPhone?

15   A    I have no idea.

16   Q    Did you sign an agreement with the Tele-Town

17   Hall company?

18   A    Did I?  I don't believe.  If I did, I don't

19   recall.

20   Q    Well, I guess this is a two-part question.

21   Are you aware of anybody on the campaign that would

22   have signed the agreement for the Tele-Town Hall

23   company?

24   A    No.

25   Q    Did the campaign hire Tele-Town Hall?

1  A    I don't know.

2  Q    How long between signing the agreement and --

3  A    I just said, I don't know whether they signed

4  the agreement, so your factual basis -- basis of

5  your question is inappropriate.  I will object as

6  to form.

7  Q    How long between --

8  A    Wait.  You said don't talk over me, please.

9  For the record, I would object to form.

10  Q    How long between when you heard of Tele-Town

11  Hall was it between when you heard of Tele-Town

12  Hall and you actually started making calls?

13  A    I don't know.

14  Q    Did you have any ongoing relationship

15  management with Tele-Town Hall?

16  A    No.

17  Q    Did you endeavor to inquire as to Tele-Town

18  Hall as to whether or not they kept a written

19  record of calls?

20  A    No.

21  Q    Did you yourself keep any written record of

22  those calls?

23  A    No.

24  Q    Under what circumstances were your calling

25  records maintained by your telephone company?

 1   A     I just told you that I didn't keep records, so

 2   I --

 3   Q     I still have --

 4   A     I'm going to again object to form.

 5   Q     Let me finish my question.  Your telephone

 6   company keeps records of calls, I'm sure.  Under

 7   what --

 8   A     Are you giving testimony or asking questions?

 9   Q     Under what circumstances were your telephone

10   company's records lost or destroyed?

11   A     I have no idea.  If you want to give

12   testimony, Mr. Perrong, you're welcome to do that

13   at the appropriate time, but please don't do it now

14   so don't tell me what you are sure of and not sure

15   of.  Okay.

16   Q     Have you made any requests of your telephone

17   company to obtain records of your calls?

18   A     None.

19   Q     Why didn't you make requests of your telephone

20   company to maintain records of the calls?

21   A     There was no reason to.

22   Q     You are aware of your duty to preserve

23   potentially discoverable information in this

24   matter?

25   A     We were not -- I was not served with any hold

1    order whatsoever.

2    Q    You're an attorney; is that correct?

3    A    Yes.

4    Q    You are aware that you have a duty to preserve

5    information when you are served with a complaint;

6    is that correct?

7    A    I -- I have preserved all documents within my

8    possession, yes.

9    Q    But you did not endeavor to inform Tele-Town

10   Hall or your telephone service providers as to the

11   fact that litigation was pending and to inform

12   them --

13   A    I don't have a copy of the pleading in front

14   of me, but I don't think Tele-Town Hall was even

15   mentioned in the pleading.  Was it?

16   Q    This is my deposition.

17   A    Yeah.  And I --

18   Q    I'm asking the questions.

19   A    And I don't believe that Tele-Town Hall was

20   even mentioned in the pleading, so there would had

21   been no reason for me to contact them.

22   Q    And there was no reason to contact your

23   telephone company?

24   A    No.

25   Q    Did your campaign have any formal policies or

1    procedures regarding the Telephone Consumer

2    Protection Act?

3    A    I don't know.

4    Q    Did you or your campaign have any formal

5    policies regarding the Telephone Consumer

6    Protection Act?

7    A    Are you asking about me or the campaign?

8    Q    I'm asking about both.

9    A    You'll have to ask the campaign about the

10   campaign.  I did not personally.

11   Q    And you are not aware in your position at the

12   campaign of any policies or procedures regarding

13   this?

14   A    I was not aware of that, no.

15   Q    Besides Tele-Town Hall, do you or your

16   campaign directly employ people who place telephone

17   calls?

18   A    Objection as to relevance.

19   Q    There is a question pending.

20   A    What's the question again?

21   Q    Did you or your campaign directly employ

22   persons who placed telephone calls?

23   A    Objection as to form.  I have no idea what you

24   are asking me.  Do people make phone calls from the

25   campaign office?  Is that the question?

1   Q     That's part of the question.  Yes.

2   A     Of course.

3   Q     Who are those individuals?

4   A     There were hundreds.  Literally hundreds of

5   people that made calls on behalf of the campaign.

6   Q     Did they use prerecorded messages to make

7   calls?

8   A     I don't know.

9   Q     Did your campaign do any marketing itself or

10  did it rely on third parties to make calls?

11  A     Objection as to form.  Again, I have no idea

12  what you are asking me.

13  Q     Did your campaign have a -- I'll rephrase.

14  Your -- you just stated that your campaign had

15  hundreds of persons making calls.  Were they

16  directly employed by the campaign or were they

17  hired through some third party --

18  A     They were largely volunteers.  Almost

19  exclusively volunteers, but staff on the campaign

20  also make calls every day, hundreds of calls.

21  Q     And how many staff, approximately, did the

22  campaign have?

23  A     It varied.

24  Q     From?

25  A     From one to four or five.

1    Q    And you said that they -- that there were

2    hundreds of volunteers that made calls.  How many

3    third-party companies did the campaign hire?

4    A    I have no idea.

5    Q    How did you typically communicate with the

6    individuals who ran the campaign that we previously

7    discussed?

8    A    I met with them.  I met with them.

9    Q    In person?

10   A    Often.  Sometimes over the phone.

11   Q    Did you have e-mails?

12   A    I'm sure we did.

13   Q    Did any of those e-mails discuss Tele-Town

14   Hall?

15   A    Not that I recall.

16   Q    Did any of those e-mails discuss the calling

17   conduct described at issue here?

18   A    I doubt it.  I don't know, but I doubt it.

19   Q    Did you -- I withdraw the question.

20              What, to your understanding,

21   did Tele-Town Hall do?

22   A    I don't know.

23   Q    You never communicated with Tele-Town Hall?

24   A    I did not.

25   Q    Do you know an attorney by the name of Adam

1     Bowser at Arent, Fox, Schiff?

2     A     What's the name again?

3     Q     Adam.  A-d-a-m.  Bowser.  B-o-w-s-e-r.

4     A     Do I know him?  I don't think -- I don't know

5     him.  The name rings a bell, but I certainly don't

6     know him.

7     Q     Did you have any communications with Attorney

8     Bowser as --

9     A     Okay.  All right.  I think I know who you

10    mean.  Yes, I did.

11    Q     And what was the nature of those

12    communications?

13    A     He called me after the campaign had concluded

14    to tell me that you were threatening litigation and

15    asking if I would settle with you.

16    Q     Do you contend that Adam Bowser represented

17    you at any time?

18    A     No.  Absolutely not.

19    Q     Did he represent your campaign at any time?

20    A     No.  Absolutely not.

21    Q     Do you have any idea who he claimed to

22    represent?

23    A     I believe -- again, I believe that he claimed

24    to represent the vendor that provided the service

25    that you are complaining of.

1    Q    Tele-Town Hall?

2    A    Yes.  If that's the name of the company.  I'm

3    not even sure if that's the name of the enterprise,

4    but if that's the technical name, yes.

5    Q    Besides this communication with Adam Bowser,

6    did you discuss the litigation with Tele-Town Hall,

7    anybody else at Tele-Town Hall?

8    A    No.

9    Q    And you discussed it with nobody else that

10   claimed to represent Tele-Town Hall?

11   A    Not to my knowledge, no.

12   Q    In what manner did you communicate with Adam

13   Bowser?

14   A    By phone.  He called me.

15   Q    Did you or the campaign receive any other

16   complaints related to telephone conduct?

17   A    None.

18   Q    Did Tele-Town Hall agree to perform work at a

19   discounted rate because of the allegations here?

20   A    I don't believe so.

21   Q    Did Tele-Town Hall offer to pay you or pay the

22   campaign?

23   A    No.

24   Q    Did you or the campaign perform any audits as

25   to Tele-Town Hall?

```
1    A     No.   Again, when I say no, not to my
2    knowledge.
3    Q     Are you aware of any corrective action taken
4    with respect to the calling conduct at issue in
5    this complaint?
6    A     No.
7              MR. PERRONG:  That's all the
8         questions I have for you, Mr. Gerow.
9                        - - -
10              (Discussion off the record.)
11                       - - -
12              (At 10:27 a.m. proceedings were
13         concluded.)
14                       - - -
15
16
17
18
19
20
21
22
23
24
25
```

1                    C E R T I F I C A T E

2

3

4          I, KIMBERLY A. BURSNER, Registered

5    Professional Reporter, do hereby certify that

6    the foregoing is an accurate transcript of the

7    proceedings, as reported by me, in the

8    case herein stated, and that I am neither

9    counsel nor kin to any party or participant in

10   said action, nor interested in the outcome

11   thereof.

12

13

14                        _____

15                        Kimberly A. Bursner
                          Registered Professional
16                        Reporter

17

18

19

20

21

22

23

24

25

                    KIMBERLY A. BURSNER, RPR
                        (610) 279-2711


November 16, 2023

CHARLES GEROW
4725 Charles Road
Mechanicsburg, PA 17050

In Re:  PERRONG vs GEROW, et al

Dear Mr. Gerow:

        With regard to your read and sign
transcript, I need to meet with you since you did
not order a copy of the transcript in front of a
notary public in order for you to read the
transcript in my presence and have it notarized.

        At that time I will supply to you the
following:

    1.   List of instructions to witness regarding
signing;
    2.   Original Signature Page;


The procedure for signature requires that the
witness:

    1.   Read copy of the deposition--see
instructions;
    2.   Sign the original signature page--see
         instructions.

If corrections are made, please notify other
counsel of them and the reasons given therefor.


Sincerely,




Kimberly A. Bursner
Registered Professional Reporter

cc:  Andrew Perrong, Esquire